UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| RONALD D. ROBINSON, SR., | ) |
| Plaintiff, | ) ) ) |
| vs. | ) 1:12-cv-00021-SEB-DKL ) |
| MICHAEL J. ASTRUE, Commissioner of the Social Security Administration, | ) ) ) ) |
| Defendant. | ) |

**ENTRY**

Ronald D. Robinson, Sr. seeks judicial review of a final decision by the Commissioner of the Social Security Administration (the "Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act ("the Act"), 42 U.S.C. § 301 *et seq.* Mr. Robinson believes that the decision denying him these benefits was not supported by substantial evidence, and he requests that the Court reverse and remand the decision of the Commissioner. For the reasons explained in this entry, Mr. Robinson's request must be denied and the judgment of the Commissioner AFFIRMED.

**I. Applicable Standard of Review**

In order to be eligible for DIB and SSI, a claimant must prove that he cannot engage in any substantial gainful activity because of "a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months." 42 U.S.C.

§§ 423(d)(1)(A), 1382c(a)(3)(A). The claimant must establish disability by presenting medical evidence of an impairment that results "from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 416.908. Such medical evidence must go beyond the claimant's statements and include signs, symptoms, and laboratory findings. *Id.* § 404.1508.

The Social Security Administration has implemented these statutory standards in part by prescribing a "five-step sequential evaluation process" for determining disability. 20 C.F.R. § 404.1520(a)(1). If disability status can be determined at any step in the process, an application will not be reviewed further. *Id.* § 404.1520(a)(4). At the first step, if the claimant is currently engaged in substantial gainful activity, then he is not disabled. *Id.* § 404.1520(b). At the second step, if the claimant's impairments are not severe, then he is not disabled. *Id.* § 404.1520(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.*

At the third step, if the claimant's impairments (either singly or in combination) meet or equal the criteria for any of the conditions included in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, then he is presumptively disabled.[1] If the claimant's impairments do not satisfy a Listing, then his residual functional capacity

---

[1] The Listing of Impairments contains a recitation of medical conditions defined by criteria that the Administration has deemed "severe enough to prevent an individual from doing any gainful activity." 20 C.F.R. § 404.1525(a).

("RFC") will be determined for purposes of the next two steps. A claimant's RFC represents his ability to perform work on a regular and continuing basis despite his impairment-related physical and mental limitations. 20 C.F.R. §§ 404.1545, 416.945. At the fourth step, if the claimant's RFC allows him to engage in his past relevant work, then he is not disabled. *Id.* § 404.1520(a)(4). The claimant bears the burden of proof at steps one through four of this process.

    At the fifth step, considering the claimant's age, work experience, and education (which are not considered at step four), and his RFC, he will not be considered disabled if he can carry out any other work in the relevant economy. 20 C.F.R. § 404.1520(a)(4). The burden of proof shifts to the Commissioner at this step to prove that jobs the claimant can perform exist in the national economy. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). For a claimant with purely exertional[2] limitations, the Commissioner may consult the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 ("the grids") to make a disability determination. The grids correlate the claimant's age, work experience, education, and RFC with a finding of "disabled" or "not-disabled." 20 C.F.R. §§ 404.1569, 404.1569a. If a claimant has non-exertional limitations or exertional limitations that restrict the full range of employment opportunities at his RFC level, then the grids may not be used at this step. In such circumstances, a vocational expert must testify regarding the number of existing jobs for a person with the claimant's particular medical conditions and vocational characteristics.

---

    [2]Exertional limitations are those which only affect a claimant's ability to meet the strength demands of jobs. 20 C.F.R. § 1569a(b).

*Id.* §§ 404.1569, 404.1569a; *Haynes v. Barnhart*, 416 F.3d 621, 629 (7th Cir. 2005); *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994). Results from the grids, however, may serve as advisory guidelines in these cases. 20 C.F.R. § 404.1569.

A district court is not tasked with providing a *de novo* determination of the claimant's entitlement to benefits, but only with deciding if the Commissioner's decision is supported by substantial evidence and is otherwise free of legal error. *Kendrick v. Shalala*, 998 F.2d 455, 458 (7th Cir. 1993). The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). This standard requires "more than a mere scintilla," but less than a preponderance, of the evidence. *Richardson*, 402 U.S. at 401; *Wood v. Thompson*, 246 F.3d 1026, 1029 (7th Cir. 2001). This limited scope of judicial review derives from Congress's intent that the Commissioner, not the courts, make disability determinations. *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).

## II. Factual Background

On September 15, 2008, Mr. Robinson filed his Title II application for a period of disability and DIB. He filed his Title XVI application for SSI on February 2, 2009. R. at 11. In both applications, he asserted a disability commencing June 15, 2005. *Id.* The state agency denied his application on initial review on May 13, 2009 and on August 18, 2009 on reconsideration. Upon request, Mr. Robinson received a hearing before an

4

administrative law judge ("ALJ"),[3] which took place on January 19, 2011. *Id.* The ALJ issued his decision finding that Mr. Robinson was not disabled on February 25, 2011, and the Appeals Council denied Mr. Robinson's request for review on November 4, 2011. *Id.* at 8, 1. At this point, the ALJ's determination became the final decision of the Commissioner regarding Mr. Robinson's right to benefits under the Act.

The ALJ first concluded that Mr. Robinson remained insured only through June 30, 2008; accordingly, Mr. Robinson must establish disability on or prior to that date. R. at 11. At step one of the sequential evaluation process, the ALJ found that Mr. Robinson had not engaged in substantial gainful activity since his alleged disability onset date. *Id.* at 13. At step two, the ALJ determined that Mr. Robinson suffered from the following severe impairments: depressive disorder, not otherwise specified; an anxiety disorder; and right knee pain derived from a medial meniscal tear. *Id.* At step three, the ALJ found that Mr. Robinson did not have an impairment or combination of impairments that met or medically equaled any of the conditions set forth in the Listing of Impairments. *Id.* The ALJ specifically stated that Mr. Robinson's physical impairment did not satisfy Listing 1.02 (major dysfunction of a joint) and that Mr. Robinson's mental impairments did not satisfy Listing 12.02 (organic mental disorders), 12.04 (affective disorders), or 12.06 (anxiety-related disorders). *Id.* at 13-14.

---

[3]Mr. Robinson, clinical psychology expert Michael Cremerius, PhD, and vocational expert James Breen appeared for the hearing in Indianapolis, Indiana. The ALJ presided over the hearing from Oak Brook, Illinois. R. at 11.

Next, the ALJ made an RFC determination and concluded that Mr. Robinson retained the capacity to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a). R. at 15. The ALJ placed additional non-exertional limitations on Mr. Robinson, recommending "simple, routine[,] and repetitive tasks with only brief and superficial interaction with the public and co-workers." *Id.* In making this determination, the ALJ did not find Mr. Robinson's statements regarding his alleged impairments (and their effect on his ability to work) credible. The ALJ then proceeded to step four and found that Mr. Robinson could not perform his past relevant work as a dishwasher. *Id.* at 17. Finally, at step five, the ALJ heard testimony of vocational expert James Breen to assist him in determining whether jobs existed in significant numbers in the national economy that Mr. Robinson could perform. *Id.* at 57-64. Mr. Breen testified that, given Mr. Robinson's age, education, work experience, and RFC as determined by the ALJ, there were roughly 5500 jobs nationally and 9300 jobs in the State of Indiana that Mr. Robinson could perform. *Id.* at 17-18. Because the ALJ deemed this number significant, he concluded that Mr. Robinson was not disabled, thus denying Mr. Robinson's request for benefits.

### III. Evidence

#### A. Medical Evidence

Pursuant to a referral by the Disability Determination Bureau, Mr. Robinson visited clinical psychologist Thomas Smith on March 25, 2009 for a mental status examination and psychological examination. Dr. Smith administered the WAIS-IV

(Wexler Adult Intelligence Scale) and determined that Mr. Robinson's full-scale IQ was 60. R. at 388. He opined that Mr. Robinson's test scores were "a minimal estimate of his level of intellectual functioning" because Mr. Robinson had been extremely drowsy during portions of the testing period. Nevertheless, Dr. Smith concluded, "[T]hese test results are probably not valid, but Mr. Robinson appears to be functioning in the mild mental retardation range." *Id.* at 389. Dr. Smith diagnosed Mr. Robinson with severe, nonpsychotic, single episode major depressive disorder; generalized anxiety disorder; suspected mild mental retardation; and pain in the knees, feet, and lower back. Further, he assigned Mr. Robinson a Global Assessment of Functioning ("GAF") score, which is a psychiatric measure of a patient's overall level of functioning. The record reflects that Mr. Robinson scored a 45 on the GAF scale—a score that indicates "[s]erious symptoms . . . *or* any serious impairment in social, occupational, or school functioning." *Jelinek v. Astrue*, 662 F.3d 805, 807 n.1 (7th Cir. 2011) (citing AM. PSYCH. ASS'N, DIAGNOSIS & STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. 2000)).

At the administrative hearing, clinical psychologist Michael Cremerius provided testimony on the subject of Mr. Robinson's alleged mental limitations. Dr. Cremerius stated that he had reviewed all medical evidence in the record, including Dr. Smith's evaluation and various files from Midtown Mental Health. R. at 29-30. He first discussed the results of the WAIS-IV and noted that Mr. Robinson had certain index composite scores over 60—namely, his perceptual reasoning score of 77. In fact, Dr. Cremerius believed that a score of 77 "[was] probably a more accurate reflection of [Mr.

7

Robinson's] overall abilities . . . [T]hat's more of a borderline intellectual functioning." *Id.* at 31. When asked if Mr. Robinson's mental impairments met or equaled a Listing, Dr. Cremerius said they did not, having considered Listings 12.02, 12.04, and 12.06. He opined that any cognitive limitations were longstanding but would only result in "moderate limitations in concentration, persistence, and pace." *Id.* at 32-34. Further, Dr. Cremerius characterized Mr. Robinson's activities of daily living as "mildly impaired" because he could manage his own care and medications, use public transportation, shop, and get along with others in a sheltered setting. *Id.* at 33-34.

The ALJ also engaged Dr. Cremerius in the following colloquy regarding whether Mr. Robinson exhibited signs of mild mental retardation:

> Q: Your conclusion of the psychologist's and the consultative examination as mild retardation, [do] you agree or disagree with that determination?
> A: No, Your Honor. She does include that as a diagnosis, but she also indicates that [Mr. Robinson] could have borderline intellectual functioning, and she posited a question of validity of the overall scores based on his effort and she said that he was falling asleep during the testing . . . . And his functional capacity, being able to use public transportation without assistance are more consistent with a borderline range of functioning.
> * * *
> I don't think that there's enough evidence to offer a diagnosis[,] though[,] of mild mental retardation. In fact, it's not established as a diagnosis. It's only suspected.

*Id.* at 35-36.

**B. Claimant's Testimony**

Mr. Robinson was born in 1961 and has completed the ninth grade. He dropped out of high school during his tenth grade year and never graduated or earned a GED. R. at 18. He reported earnings from the Pepper Match Corporation in 2005, although he

8

testified before the ALJ that "[he] didn't work . . . [the company] paid [him] for just showing up." *Id.* at 41. His most recent employment before that time was at McDonald's in 1998, where he worked as a dishwasher. *Id.*

At the time of his administrative hearing, Mr. Robinson asserted that he was homeless and had spent the previous night in an abandoned car. *Id.* at 40. He testified that he lived under a bridge and relied on food stamps as his sole source of income. *Id.* at 42, 44-45. Excluding a period of incarceration that ended in 2005, he has not maintained a residence of his own since 1985. *Id.* at 15, 47. Thus, for the past several years, Mr. Robinson's typical day has involved riding a city bus to friends' houses or various fast food establishments (in order to rest and warm up), spending the remainder of the day at Horizon House (a day center for the homeless in downtown Indianapolis), and leaving at 8:00 p.m. to seek shelter for the night. *Id.* at 43-45. He receives clothes and toiletries from Horizon House, and he has a cell phone for which his sister pays the bill. Mr. Robinson's sister also resides in Indianapolis but does not permit him to stay at her home. *Id.* at 46, 49.

Mr. Robinson testified that walking causes him a great deal of pain in his knees and feet. R. at 48. Although he stated that he can walk between bus stops, he claimed it was a struggle to walk half a block and that, generally, "it would take [him] like [thirty] minutes" before he would need to stop walking. *Id.* at 46, 52. To manage his pain, he obtains Vicodin and anti-inflammatories from Wishard Hospital. *Id.* at 46, 49. He also takes Zoloft for depression and abstains from alcohol, drugs, and cigarettes. *Id.* at 49.

## IV. Analysis

Mr. Robinson contends that the ALJ's decision is not supported by substantial evidence. More specifically, he asserts three errors with respect to the decision: (1) that the ALJ improperly determined that his impairments did not satisfy Listings 12.05C or 12.04; (2) that the ALJ's credibility determination was flawed; and (3) that the ALJ's hypothetical questions at step five did not accurately describe his impairments.

### A. Step Three Determination

A claimant asserting error at step three of the sequential evaluation process has the burden of proving that his impairments met or medically equaled a Listing. *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012). In other words, he must demonstrate that his impairments "satisfy all of the various criteria specified in the [L]isting." *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). Here, Mr. Robinson contends that substantial evidence in the record supports a finding that his impairment satisfied Listing 12.05C or Listing 12.04. Pl.'s Br. at 9. Listing 12.05C requires "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App'x 1. Listing 12.04 requires, among other carefully circumscribed symptoms, "a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." *Id.*

According to Mr. Robinson, Listing 12.05C "was proved by Dr. Smith's . . . psychological evaluation." Pl.'s Br. at 9. He argues that his IQ (60), history of special

education, diagnosed major depression and generalized anxiety, and GAF score (45) corroborate a finding that his mental impairments met or medically equaled this Listing. Moreover, he contends, the ALJ's failure to mention Listing 12.05 "requires reversal." *Id.* at 10. Mr. Robinson places special emphasis on his GAF score, alleging that GAF assessments are acceptable evidence of disability and that the ALJ gave improper weight to his score. In slapdash form (*i.e.*, without explanation or analysis), he cites eight cases from within our circuit to support his position that this score "proves" disability. *Id.* at 11-12. These arguments,[4] whether considered singly or in the aggregate, do not meet the burden imposed upon claimants seeking judicial review of disability determinations.

Here, the ALJ properly considered evidence favoring Mr. Robinson as well as evidence favoring rejection of the claim, as the Seventh Circuit requires. *See Stephens v. Heckler*, 766 F.2d 284, 288 (7th Cir. 1985). He "acknowledge[d] potentially dispositive evidence," *id.*, to wit: low IQ, depressive and anxiety disorders (and treatment for such disorders), and Mr. Robinson's behavior and testimony at the administrative hearing. Considering all of the foregoing, the ALJ found no evidence of the limitation of function that would have been required to satisfy Listings 12.05C or 12.04. We conclude, therefore, that these findings are supported by substantial evidence. As the ALJ observed, many of Mr. Robinson's capabilities negate these Listings. Among other things, Mr. Robinson: has never been hospitalized for a mental disorder; responds well

---

[4] Mr. Robinson also argues that *Ribaudo v. Barnhart*, 458 F.3d 580, 583-84 (7th Cir. 2006) requires reversal of the Commissioner's decision. Pl.'s Br. at 12. In that case, the Seventh Circuit deemed the ALJ's step three finding "cursory" because it was limited to two sentences and mentioned no specific Listings the ALJ might have considered. *Ribaudo*, 458 F.3d at 583. *Ribaudo* is clearly not analogous to the instant case, and we reject this argument.

to treatment; has not experienced episodes of decompensation; is only mildly restricted in his activities of daily living; walks around the city and uses public transportation without assistance; competently uses a cell phone; and can "respond to questions in an appropriate manner with appropriate social skills." R. at 13-16. The ALJ noted that no evidence in the record would support a finding that Mr. Robinson could not perform unskilled work, which indicates that he adequately reviewed whether Mr. Robinson had a "significant work-related limitation of function" (12.05C) or "marked impairment in activities of daily living and social function" (12.04). *Id.* at 16. Without more evidence of "marked" activities under Listing 12.05C or 12.04, the ALJ's reliance on the abovementioned activities as substantial evidence to support his decision was entirely reasonable.

Nothing about the ALJ's written opinion persuades us to disturb his step three determination by substituting our own judgment for his. The ALJ was not required to base his decision solely upon Dr. Smith's consultative examination. He was presumably well aware that "[a] statement by a medical source that [a claimant] is 'disabled' or 'unable to work' does not mean that [an ALJ] will determine that [the claimant is] disabled." 20 C.F.R. § 404.1527(d)(1). Furthermore, he was under no obligation to treat a GAF score based on one assessment as *prima facie* satisfaction of Listing 12.05C or 12.04. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("[N]owhere do the Social Security regulations or case law require an ALJ to determine the extent of . . . disability based entirely on [a] GAF score."). The cases Mr. Robinson offers in support of his GAF

12

argument involve multiple rounds of testing; his own case reflects an isolated score that cannot reasonably be expected to establish disability. Therefore, because Mr. Robinson has failed to demonstrate that his alleged mental impairments satisfy all the criteria for Listing 12.05C or 12.04, we uphold the Commissioner's step three findings.

### B. Credibility Determination

Part of the five-step sequential evaluation process involves the ALJ's assessment of the claimant's credibility "[s]ince symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone." 20 CFR § 404.1529(c)(3). A wide variety of factors relevant to the claimant's symptoms will be considered, such as daily activities, aggravating factors, pain (including the location, frequency, and intensity thereof), medications, and other modalities used to ameliorate symptoms. *Id.*; *see also* SSR 96-7p. In making his credibility determination, the ALJ must "consider the entire case record and give specific reasons for the weight given to the individual's statements." SSR 96–7p. The ALJ, not the reviewing court, is in the best position to evaluate credibility, so we review credibility determinations with deference. *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009). We will reverse a credibility determination only where it "is so lacking in explanation or support that we find it 'patently wrong.'" *Id.* (quoting *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008)).

Mr. Robinson asserts that the ALJ's "apparently intentional vagueness in the credibility determination" deprives this court of an opportunity for meaningful review of the denial of benefits. Pl.'s Br. at 15. He argues that the ALJ omitted from his decision

"[t]he location, duration, frequency, and intensity of [his] . . . symptoms . . . because the ALJ ignored Dr. Smith's assessed GAF 45." Pl.'s Br. at 14. This statement is neither logical nor true. The ALJ clearly articulated the "location" of many of Mr. Robinson's symptoms, such as sleep, appetite, weakness, irritability, fatigue, restlessness. He also discussed duration, frequency, and intensity in several instances, to wit: "*varied* appetite," "feeling sad *all* of the time," "*some* evidence of intellectual deficiencies," "*easy* fatigue," and "*frequent* thoughts of suicide." R. at 13-16. Finally, even giving Mr. Robinson the benefit of the doubt with respect to social functioning, the ALJ found Mr. Robinson insufficiently credible because "[his] testimony [was] not consistent with the medical records[,] and his activities of daily living [were] not consistent with his complaints." *Id.* at 16.

    We believe substantial evidence supports the ALJ's finding that Mr. Robinson's allegations were not credible. Although the ALJ's credibility determination was by no means perfectly articulated, it was decidedly neither perfunctory nor "patently wrong." The ALJ outlined several reasons (properly referencing the record) to support his skepticism regarding Mr. Robinson's description of his symptoms and the extent of limitations they imposed. He did not misstate the evidence or state his findings in a single boilerplate recitation. Rather, he mustered a respectable cadre of facts upon which to base his opinion finding that Mr. Robinson was not credible. We concede that the ALJ could have explained in greater detail his decision affording great weight to Dr. Cremerius's opinion. Nevertheless, he did express the basis for his agreement with Dr.

Cremerius's assessment of Mr. Robinson's IQ test and medical records. R. at 16. This suffices for purposes of our conducting a meaningful review, given that an ALJ "need not mention every strand of evidence in [his] decision." *Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012). Because the ALJ's considerations specifically incorporated testimony and medical evidence, his credibility determination does not contravene SSR 96-7p. We, therefore, affirm the Commissioner's credibility determination.

### C. Hypothetical Questions

Given Mr. Robinson's protestation that the ALJ made a "perfunctory" decision, his own third argument is surprisingly scant. Mr. Robinson frames his assertion vaguely: "[s]ubstantial evidence fails to support the . . . determination that [he] was not disabled because he could perform some jobs." Pl.'s Br. at 16. The remainder of the argument consists of a series of four non sequiturs: (1) the RFC omits "that [he] would not be able to keep a job, as shown by the GAF;" (2) the ALJ did not consider all documented impairments; (3) the hypothetical questions posed to Mr. Breen did not accurately describe Mr. Robinson's impairments; and (4) *O'Conner-Spinner v. Astrue*, 627 F.3d 614 (7th Cir. 2010) mandates reversal. *Id.* Having addressed *supra* the first two statements, we must dismiss the fourth claim as inapposite to Mr. Robinson's case. That brings us to his third claim relating to the ALJ's hypothetical questions.

"Hypothetical questions posed to vocational experts ordinarily must include *all* limitations supported by medical evidence in the record." *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). Here, the ALJ asked Mr. Breen a series of detailed hypothetical

15

questions, first inquiring as to what work a person of Mr. Robinson's age, employment experience, education, skill set, and lifting/carrying limitations could perform.  R. at 59.  Next, he added the variable of performing simple, routine, repetitive tasks.  He then addressed the possibility of limiting Mr. Robinson's social interactions with both the public and potential co-workers.  *Id.* at 60.  After asking whether such a hypothetical person could engage in sedentary work, the ALJ asked Mr. Breen to consider a hypothetical claimant with medical and mental impairments, pain, and postural limitations.  *Id.* at 61.  We see nothing about this line of questioning that warrants remand.

   Earlier in this entry, we expressed our view that the ALJ appropriately assessed Mr. Robinson's ailments at each step leading up to the final part of the sequential evaluation process.  The administrative record demonstrates that the ALJ thoroughly and fairly weighed the entirety of the medical evidence with an eye toward Mr. Robinson's personal characteristics.  Because the ALJ concluded that such evidence did not support a finding of more stringent limitations on Mr. Robinson than those indicated at the RFC phase, he was not required to include additional limitations in his hypothetical questions.  *Johnson v. Astrue*, No. 1:10-cv-1359-SEB-DKL, 2012 WL 1099768, at *9 (S.D. Ind. Mar. 30, 2012).  "ALJs must provide vocational experts with a complete picture of a claimant's residual functional capacity," *Jelinek*, 662 F.3d at 813, which is precisely what the ALJ did in Mr. Robinson's case.  As a result, we find no error in the ALJ's

16

hypothetical questioning and will not disturb his step five findings or his ultimate conclusion that Mr. Robinson is not disabled.

## Conclusion

For the reasons detailed above, the Court concludes that Mr. Robinson has failed to establish that the Commissioner's decision was either unsupported by substantial evidence in the record or based on any legal error requiring reversal. Accordingly, we AFFIRM the Commissioner's denial of Mr. Robinson's application for benefits.

IT IS SO ORDERED.

Date:  _____02/14/2013_____

_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Patrick H. Mulvany
patrick@mulvanylaw.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov